# OLGA J. DISTEFANO *v.* JOSEPH E. MILARDO, JR., ET AL.
## (SC 17221)

Sullivan, C. J., and Borden, Katz, Palmer and Zarella, Js.

Argued September 8—officially released December 13, 2005

*Lawrence S. Dressler*, for the appellant (plaintiff).

*Michael C. Conroy*, for the appellees (named defendant et al.).

*Opinion*

SULLIVAN, C. J. The sole issue in this certified appeal is whether the trial court properly instructed the jury that no attorney-client relationship existed between the named defendant, Joseph E. Milardo, Jr., a partner in the law firm of Jozus, Milardo and Thomasson (law firm),[1] and the plaintiff's son, Lawrence J. DiStefano, when it instructed the jury on the allegation of breach of fiduciary duty. The plaintiff, Olga J. DiStefano, appeals, following our grant of certification from the judgment of the Appellate Court affirming the trial court's judgment in favor of the defendants. *DiStefano* v. *Milardo*, 82 Conn. App. 838, 848, 847 A.2d 1034 (2004). The trial court directed a verdict in favor of the defendants on the malpractice and breach of contract counts, and the jury returned a verdict in favor of the defendants on

[1] The law firm is also named as a defendant in this lawsuit under the theory of respondeat superior.

the remaining counts of breach of fiduciary duty and negligent infliction of emotional distress. The Appellate Court affirmed the trial court's judgment. We affirm the judgment of the Appellate Court.

The opinion of the Appellate Court sets forth the following facts and procedural history. "The plaintiff and her husband, Sebastian DiStefano, had three children: Steven DiStefano, Lawrence DiStefano and Luann Filer. The defendants represented both Sebastian DiStefano and the plaintiff on various legal matters from 1991 through 1995.

"In February, 1992, Milardo prepared a will for the plaintiff naming Sebastian DiStefano and Lawrence DiStefano as the beneficiaries. In March, 1995, Sebastian DiStefano died. Shortly thereafter, the plaintiff opened a joint checking account with Lawrence DiStefano. From May 5 through 8, 1995, she was hospitalized for alcoholism and related symptoms. On May 10, 1995, Milardo drafted a power of attorney, including a provision granting Lawrence DiStefano the right to make gifts to himself from her property or accounts. On the same day, Milardo drafted a living will and a document naming Lawrence DiStefano as conservator in the event of her future incapacity. The plaintiff executed all of those documents.

"The plaintiff was again hospitalized for alcoholism and related symptoms from September 22 through 28, 1995. During her hospitalization, Lawrence DiStefano warned her that his two siblings were attempting to take control of her financial affairs. While in the hospital, she requested that Milardo draft a trust agreement for her, naming Lawrence DiStefano as the trustee. She signed the trust agreement in the hospital.

"The agreement listed certain real property, located in Middletown and Rockfall, owned by the plaintiff. The plaintiff also created a trust account, not listed in the

trust agreement, of which Lawrence DiStefano was named the trustee. At the time she signed the trust agreement, the plaintiff also signed two quitclaim deeds, prepared by Milardo, transferring the Middletown and Rockfall properties into Lawrence DiStefano's name. Milardo handled the subsequent sale of these properties.

"After her release from the hospital, she requested that Milardo remove Lawrence DiStefano's authority from her financial affairs. She also spoke to Milardo about revoking the trust. Milardo reminded her that the trust was crafted to protect her assets from her other two children and to manage her real property.

"The plaintiff was hospitalized twice more for alcoholism and related symptoms in October, 1995, and was admitted for inpatient treatment for alcoholism and depression on June 21, 1996. On August 6, 1996, she revoked the trust agreement and closed the joint checking account.[2]

"On July 6, 1998, the plaintiff filed the four count complaint in this action alleging (1) legal malpractice, (2) breach of contract, (3) breach of fiduciary duty and (4) negligent infliction of emotional distress." Id., 840–41. In support of the breach of fiduciary duty claim, the plaintiff argued that there was an attorney-client relationship between Milardo and Lawrence DiStefano that created a conflict of interest.

"The case proceeded to trial before the jury. The court directed a verdict in favor of the defendants on the counts of legal malpractice and breach of contract on the ground that the plaintiff had failed to present expert testimony on the issue of proximate cause. The jury returned a verdict in favor of the defendants on

---

[2] The plaintiff employed new counsel, Mark Sciota, to help her revoke the agreement and to close her account. The defendants were not involved in those transactions.

the breach of fiduciary duty and negligent infliction of emotional distress counts." Id., 841.

On appeal to the Appellate Court, the plaintiff claimed that the trial court had "improperly (1) directed a verdict in favor of the defendants on the malpractice count, (2) instructed the jury that no attorney-client relationship existed between the defendants and the plaintiff's son, Lawrence J. DiStefano [when charging the jury on the breach of fiduciary count],[3] and (3) refused to allow the jury to consider evidence of the standard of care for an attorney for breach of a fiduciary duty." Id., 839. The Appellate Court rejected the plaintiff's first and third claims, which are not at issue in this appeal. Id., 844, 848.

With regard to the second claim, the Appellate Court concluded that the trial court properly had charged the jury that no attorney-client relationship existed between Milardo and Lawrence DiStefano. Id., 845–47. We granted the plaintiff's petition for certification to appeal limited to the following issue: "Did the Appellate Court properly determine that the trial court properly had instructed the jury that no attorney-client relationship existed between the named defendant, Joseph E.

[3] The court instructed the jury: "In this case the plaintiff claims and must prove that the defendants had a conflict of interest or a conflict of loyalties between the plaintiff and her son, Lawrence DiStefano, and that their actions in advising the plaintiff concerning the trust were influenced by this loyalty to [Lawrence] DiStefano which conflicted, the plaintiff claims, with their loyalty to her. You may not find that the defendants had any loyalty to [Lawrence] DiStefano arising out of an attorney-client relationship between them, that is between . . . Lawrence DiStefano and [Milardo], because there is no evidence that any such relationship existed at the time of any of the events at issue here. Therefore, you may only find that the defendants had feelings of loyalty toward [Lawrence] DiStefano based on some personal relationship the plaintiff has proven existed between the defendants and Lawrence DiStefano. It is not improper for the defendants simply to have had a personal relationship with Lawrence DiStefano; it is only improper and a breach of their fiduciary duty if they allowed that personal relationship to detract from their undivided loyalty to the plaintiff."

Milardo, Jr., and Lawrence J. DiStefano?" *DiStefano* v. *Milardo*, 270 Conn. 908, 853 A.2d 524 (2004).

"Our analysis begins with a well established standard of review. When reviewing [a] challenged jury instruction . . . we must adhere to the well settled rule that a charge to the jury is to be considered in its entirety, read as a whole, and judged by its total effect rather than by its individual component parts. . . . [T]he test of a court's charge is not whether it is as accurate upon legal principles as the opinions of a court of last resort but whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper." (Internal quotation marks omitted.) *Jacobs* v. *General Electric Co.*, 275 Conn. 395, 400, 850 A.2d 151 (2005).

"The court has a duty to submit to the jury no issue upon which the evidence would not reasonably support a finding." (Internal quotation marks omitted.) *Wrinn* v. *State*, 234 Conn. 401, 407–408, 661 A.2d 1034 (1995). "Although it is the jury's right to draw logical deductions and make reasonable inferences from the facts proven . . . it may not resort to mere conjecture and speculation." (Internal quotation marks omitted.) *Janusauskas* v. *Fichman*, 264 Conn. 796, 803, 826 A.2d 1066 (2003). The court should, however, submit to the jury "the issues as outlined by the pleadings and as reasonably supported by the evidence." 1 D. Wright, Connecticut Jury Instructions (2d Ed. 1970) § 2, p. 3; see *Goodmaster* v. *Houser*, 225 Conn. 637, 648, 625 A.2d 1366 (1993).

When reviewing a trial court's decision that the evidence was not sufficient to support the submission of an issue to the jury, we must consider the evidence produced by the plaintiff in the light most favorable

to him. See *Godwin* v. *Danbury Eye Physicians & Surgeons, P.C.,* 254 Conn. 131, 135–36, 757 A.2d 516 (2000). Whether the plaintiff has established a prima facie case entitling the plaintiff to submit a claim to a trier of fact is a question of law over which our review is plenary. See *Falker* v. *Samperi,* 190 Conn. 412, 419, 461 A.2d 681 (1983).

"An attorney-client relationship is established when the advice and assistance of the attorney is sought and received in matters pertinent to his profession." *Somma* v. *Gracey,* 15 Conn. App. 371, 379, 544 A.2d 668 (1988). The burden of establishing an attorney-client relationship is on the party claiming the existence of such a relationship. See *Solomon* v. *Aberman,* 196 Conn. 359, 384, 493 A.2d 193 (1985). Evidence of either a retainer agreement or a contract between the parties is relevant to the determination of its existence. See, e.g., *Dubreuil* v. *Witt,* 65 Conn. App. 35, 43–44, 781 A.2d 503 (2001).

In her brief, the plaintiff cites the following facts as evidence that Milardo had an attorney-client relationship with Lawrence DiStefano during the period in which Lawrence DiStefano withdrew funds from her account: (1) Milardo prepared a power of attorney for the plaintiff giving Lawrence DiStefano unlimited gift giving authority; (2) Milardo drafted the plaintiff's will naming Lawrence DiStefano as the sole beneficiary; (3) Milardo prepared a living will for the plaintiff naming Lawrence DiStefano as conservator in the event that the plaintiff became incapacitated; (4) Milardo prepared a trust agreement for the plaintiff naming Lawrence DiStefano as the trustee; (5) Milardo prepared two quit-claim deeds transferring real property from the plaintiff to a trust with Lawrence DiStefano as trustee; (6) Milardo was involved in the sale of the trust properties to third persons, resulting in the transfer of sale proceeds to Lawrence DiStefano as trustee; (7) Milardo

provided Lawrence DiStefano with fatherly advice[4] about his mother's alcoholism; and (8) Milardo prepared a draft of an involuntary conservatorship application without having been requested to do so by the plaintiff.

With respect to the first six items, we agree with the Appellate Court that "the evidence taken as a whole fails to reasonably support a finding of an attorney-client relationship" between Lawrence DiStefano and Milardo. *DiStefano* v. *Milardo,* supra, 82 Conn. App. 847. The plaintiff implicitly argues that the mere fact that Lawrence DiStefano indirectly benefited from the estate planning instruments prepared by Milardo on the plaintiff's behalf gave rise to an attorney-client relationship.[5] Even if we assume, however, that Milardo had some motive or intent to benefit Lawrence DiStefano at the plaintiff's expense, it would be purely speculative to conclude that such a motive arose from an attorney-client relationship with Lawrence DiStefano. With regard to the seventh item, we further agree with the Appellate Court that "giving advice of a fatherly nature about a family member's drinking problem falls well short of establishing an attorney-client relationship." Id., 846–47.

The eighth item relating to the involuntary conservatorship, which the Appellate Court did not address, requires some additional discussion. The record reflects the following additional facts relevant to this claim. Milardo testified that in April, 1996, Lawrence DiStefano

---

[4] For example, Milardo advised Lawrence DiStefano that the plaintiff should become more socially involved so that she would spend less time at home alone.

[5] We note that Milardo represented Lawrence DiStefano at the plaintiff's request in a breach of the peace incident in 1992. This representation was limited: Milardo spoke with either the plaintiff or Lawrence DiStefano on the telephone one day and represented Lawrence DiStefano in court the next day. Moreover, the plaintiff does not argue that Milardo continuously represented Lawrence DiStefano as a result of that criminal representation.

came to his office and requested that he complete a voluntary conservatorship form for Lawrence DiStefano to be designated conservator, because the plaintiff's alcoholism had become worse. Milardo advised Lawrence DiStefano that he could not do so until he had spoken with the plaintiff. He immediately called the plaintiff, who made it clear that she did not want a voluntary conservatorship. Milardo then told Lawrence DiStefano that he could not help him because he represented the plaintiff's interests. Milardo referred Lawrence DiStefano to another attorney, Stephen Gionfriddo, who filed an application for involuntary conservatorship on Lawrence DiStefano's behalf in July, 1996. The plaintiff's file in Milardo's office contained a draft of an application for involuntary conservatorship. Milardo testified that he had asked his staff to prepare a voluntary conservatorship application, but his staff had prepared an application for involuntary conservatorship "inaccurately" and "incorrectly." That application was not dated and Milardo was never asked when it was prepared or why he made the request. In other words, there was no evidence of the circumstances surrounding its creation.

We conclude that this set of facts, when viewed in the light most favorable to the plaintiff, also fails to provide sufficient evidence to reasonably support her claim that Milardo and Lawrence DiStefano had an attorney-client relationship. The uncontroverted evidence reveals that Milardo immediately called the plaintiff to inquire whether he should comply with Lawrence DiStefano's request to prepare a voluntary conservatorship application. When the plaintiff told Milardo not to prepare the application, he informed Lawrence DiStefano and told him that he needed to find another attorney. The plaintiff presented no evidence that Milardo asked his staff to draft the application in response to, or even subsequent to, Lawrence

DiStefano's request, or that Lawrence DiStefano was aware that such a draft had been prepared.[6] In short,

---

[6] At trial, the following colloquy took place between the plaintiff's counsel and Milardo:

"[The Plaintiff's Counsel]: Did there come a time when you drafted a voluntary conservatorship at the behest of Lawrence DiStefano to have . . . Lawrence appointed [as the plaintiff's] conservator?

"[Milardo]: No.

"[The Plaintiff's Counsel]: You never drafted that document?

"[Milardo]: I did not.

"[The Plaintiff's Counsel]: Did your office?

"[Milardo]: I don't believe any voluntary conservatorship was ever drafted, because [the plaintiff] told me she didn't want one.

"[The Plaintiff's Counsel]: Did your office draft an involuntary conservatorship?

"[Milardo]: I believe someone in my office typed up an involuntary conservatorship application form. It was typed up inaccurately, incorrectly, and it still sits in my file today unsigned and unissued.

"[The Plaintiff's Counsel]: But was there an involuntary conservatorship application drafted by your office at the behest of Lawrence DiStefano?

"[Milardo]: I instructed my staff to prepare a voluntary conservatorship application. They prepared the wrong application, and that sits in my file today. It was not signed. And we did not do a nonvoluntary conservatorship because [the plaintiff] said she wouldn't cooperate in doing one.

"[The Plaintiff's Counsel]: At that time what did you advise Lawrence DiStefano?

"[Milardo]: I said to take it—you're talking about the time that they requested . . . a voluntary application?

"[The Plaintiff's Counsel]: Yes.

"[Milardo]: [Lawrence] DiStefano came to my office, asked me that it was time, the doctors had told him that [the plaintiff] had to go possibly into a convalescent home, her bouts with alcoholism had gotten worse and worse. This was in April of 1996. . . . [H]e said, 'It's now time. I've been designated the conservator, we've planned for this, she planned for this in case she ever got to this point.'

"I advised [Lawrence] DiStefano at that time that I could not in any way cooperate in any such endeavor until I spoke with [the plaintiff]. I believe he was in my office. I called [the plaintiff] on the phone and said, 'Olga, your son says that the doctors are indicating that it's time for you to perhaps have to go into a convalescent home. You need longer time for recuperation and rehabilitation with your problem.' I never referred to it as alcoholism. I tried to be gentle with her and say it was a problem. And she indicated, 'No, I do not want that. Do not do it.'

"I turned to [Lawrence DiStefano] at that point after I hung up. It was a very brief conversation. I said, 'Your mother just informed me very explicitly, I don't believe she's under the influence now, that she does not want a

the link between Lawrence DiStefano and the draft of the involuntary conservatorship application in the plaintiff's file in Milardo's office is attenuated and speculative. Accordingly, we conclude that the Appellate Court properly affirmed the trial court's instruction that no attorney-client relationship existed between Lawrence DiStefano and Milardo because the plaintiff presented no evidence from which the jury could make a reasonable inference that Lawrence DiStefano had both sought *and received* Milardo's advice and assistance and that an attorney-client relationship existed between them.

The judgment of the Appellate Court is affirmed.

In this opinion the other justices concurred.

voluntary conservatorship and she does not want me to prepare any such document.' I said, 'You're going to have to go to someone else if you want to do this because I'm going to have to represent your mother and your mother's interest, and she may in fact—there may be a potential here that we're going to have a dispute over this.' That was in approximately April of 1996."

While we recognize that Milardo drafted an involuntary conservatorship that the plaintiff had not requested, the plaintiff failed to reasonably establish through testimony or other evidence at trial that Milardo had asked his staff to draft the application in response to Lawrence DiStefano's request, or even subsequent to Lawrence DiStefano's request.