RICHARD LAPOINTE *v.* COMMISSIONER OF
CORRECTION
(AC 29137)

Harper, Robinson and West, Js.

Argued October 20, 2008—officially released March 31, 2009

*Paul Casteleiro*, pro hac vice, with whom was *W. James Cousins*, for the appellant (petitioner).

*Jo Anne Sulik*, senior assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, state's attorney, and *Michael E. O'Hare*, supervisory assistant state's attorney, for the appellee (respondent).

*Opinion*

ROBINSON, J. The petitioner, Richard Lapointe, appeals from the judgment of the habeas court dismissing his second petition for a writ of habeas corpus. In this appeal, the petitioner claims that the court improperly dismissed his claims that his first habeas counsel was ineffective in failing to recognize or to offer proof regarding (1) the state's suppression of exculpatory evidence and (2) the ineffective assistance of criminal trial counsel. We affirm in part and reverse in part the judgment of the habeas court.

This case has a lengthy history, and the following facts and procedural history provide the necessary backdrop for the petitioner's appeal. On June 30, 1992, after a trial to the jury, the petitioner was convicted of capital felony in violation of General Statutes (Rev. to 1987) § 53a-54b (7), arson murder in violation of General Statutes § 53a-54d, felony murder in violation of General Statutes (Rev. to 1987) § 53a-54c, murder in violation of General Statutes § 53a-54a, arson in the first degree in violation of General Statutes § 53a-111, assault in the first degree in violation of General Statutes § 53a-59 (a) (1), sexual assault in the first degree in violation of General Statutes § 53a-70 (a), sexual assault in the third degree in violation of General Statutes § 53a-72a (a) (1) (A) and kidnapping in the first degree in violation of General Statutes § 53a-92 (a ) (2) (A). Thereafter, the petitioner was sentenced to life in prison without the possibility of release. The petitioner directly appealed to our Supreme Court; however, his conviction was

affirmed in *State* v. *Lapointe*, 237 Conn. 694, 678 A.2d 942, cert. denied, 519 U.S. 994, 117 S. Ct. 484, 136 L. Ed. 2d 378 (1996).

The facts underlying the petitioner's conviction were recounted in the decision of our Supreme Court disposing of his direct appeal. As the petitioner makes numerous factual claims, a restatement of these facts, as the Supreme Court determined reasonably could have been found by the jury, are helpful for context. "On March 8, 1987, the [petitioner] called the emergency telephone number, 911, to report a fire at the Manchester apartment of the victim, Bernice Martin, his wife's eighty-eight year old grandmother. Manchester firefighters entered the smoke-filled apartment and found the victim lying on the floor approximately six to eight feet from a burning couch. The victim was only partially clad and a piece of fabric was tied tightly around her neck. Other fabric was tied loosely about her wrists. The firefighters noted a bloodstain on the bed in the apartment. Paramedics who arrived at the scene attempted unsuccessfully to resuscitate the victim and subsequently transported her to a hospital where she was pronounced dead shortly after her arrival. Medical personnel did not examine the victim for sexual trauma on the night of her death and did not provide the family with any information pertaining to the cause of death. A priest in attendance, however, did tell family members gathered at the hospital that the victim had been stabbed.

"A knife blade and a melted brown plastic knife handle were found in the victim's apartment. The victim's underwear was found on the floor of the apartment to the right of the bed. No latent fingerprints were discovered at the scene due to fire and water damage. It was determined that the fire in the victim's apartment had three points of origin—the couch, near which the

victim had been found, and two towels that were hanging in the kitchen. There was no evidence that an accelerant had been used to hasten the fire's progress. The couch, which had extensive fire damage, was tested and found to burn at a very slow rate and to emit copious amounts of smoke.

"At approximately midnight on the night that the victim's body was found, Detective Edward Wilson of the Manchester police department interviewed the [petitioner]. The [petitioner] told Wilson that on March 8, from approximately 2 to 4 p.m., he had visited the victim at her apartment with his wife, Karen, and his son, Sean. The [petitioner] also told Wilson that after the family had returned home from their visit he had not left the house until his wife's aunt, Natalie Howard, had telephoned between 7:30 and 7:45 p.m., asking him to check on the victim because she was not answering her telephone. The [petitioner] further told Wilson that, while he was walking to the victim's apartment in order to check on her, he had smelled smoke. He also said that after arriving at the apartment and receiving no answer to his knock, he had attempted to enter both the front and the back doors but that both doors were locked. The [petitioner] stated that the back door felt warm to the touch.

"The [petitioner] said that he then had gone to the apartment of Jeannette King, a neighbor of the victim, to telephone his wife and Howard. Despite having smelled smoke and having felt the heat of the door to the victim's apartment, the [petitioner] made no effort to secure emergency assistance at that time. Rather, he walked to King's apartment and knocked on the door furthest from the victim's apartment. When King opened the door, the [petitioner] greeted her calmly and without any sign of urgency. The [petitioner] asked King for change for a quarter so that he could use a pay telephone

down the road. King, who had met the [petitioner] previously, invited him to use her telephone. He did so, telephoning both his wife and Howard and telling them that the victim had not answered her door and that she must have been sleeping. He never mentioned to either his wife or Howard that he had smelled smoke or that the door to the victim's apartment had been warm to the touch. Howard reminded the [petitioner] that the victim never went to bed as early as 8 p.m. and told him that she was going to the victim's apartment immediately to check on her. The [petitioner] then left King's apartment and returned to the victim's apartment. The [petitioner] claimed that upon returning to the victim's apartment, he saw smoke emanating from under the eaves. He then returned to King's apartment, again knocked on the more distant of the two doors, and, when admitted, called the 911 emergency telephone number.

"On March 9, 1987, an autopsy of the victim's body by the medical examiner revealed that the victim had suffered a three inch deep stab wound to her abdomen and ten less severe stab wounds to her back. The medical examiner also determined that the victim had been strangled and that she had sustained premortem first and second degree burns. The cause of death was determined to be a combination of strangulation and smoke inhalation. The autopsy also revealed, for the first time, that the victim had suffered extensive hemorrhaging as well as lacerations and contusions to her vagina.

"The jury further could have found that a stain on the victim's bedspread was human semen from a person who was a secretor with Type A blood. The [petitioner] has Type A blood and is a secretor. The semen stain also was found to contain no sperm, which is consistent with the semen of a person who has had a vasectomy. The [petitioner] had a vasectomy after the birth of his

son in 1979. On March 9, before any information regarding a possible sexual assault became known to the police or the public, the [petitioner] stated in a conversation with Eileen Giacalone, a friend of the Lapointe family, that 'it was a shame they killed an old lady, but they didn't have to rape her, too.' When asked in a June, 1989 interview by Detective Paul Lombardo how he had learned that the victim had been sexually assaulted, the [petitioner] responded that he had been informed by a doctor at the hospital on the night of the murder that the victim had been strangled, stabbed and sexually assaulted. The medical personnel who had attended to the victim unanimously testified, however, that they did not check the victim for sexual assault trauma when she was at the hospital that night and, further, that it would have been highly unusual for them to have done so under the circumstances. Other family members who had been present at the hospital corroborated the testimony of the medical personnel who said that there had been no mention of sexual assault at the hospital.

"On March 9, officer Wayne Rautenberg interviewed the [petitioner] at the Manchester police station. During the interview, the [petitioner] exhibited considerable curiosity concerning the results of the autopsy and asked if there had been causes of death other than smoke inhalation. The [petitioner's] curiosity was further manifested by his persistent questions to Wilson and Captain Joseph Brooks of the Manchester police department concerning the status of the investigation and whether he was a suspect. These inquiries were made during numerous chance encounters that the [petitioner] had with the officers in Manchester between the dates of the victim's death and the [petitioner's] arrest.

"The police investigation of the victim's death remained open and unresolved until March, 1989, when,

due to internal changes at the Manchester police department, Lombardo was assigned to the case. Because the investigation had been dormant for some time, Lombardo decided to reinterview all those persons who had been interviewed previously. For that purpose, Lombardo telephoned the [petitioner] in June, 1989, and asked if he would submit to another interview. The [petitioner] initially responded, 'Why, am I a suspect?' The [petitioner], however, acquiesced to Lombardo's request and, on June 8, walked to the police station where he spoke with Lombardo. At that time, in order to check the [petitioner's] blood type, Lombardo asked the [petitioner] for a saliva sample, which the [petitioner] provided. The [petitioner's] wife, in response to a direct question and in the [petitioner's] presence, had previously told [Detective] Michael Ludlow that the [petitioner's] blood was Type O. An analysis of the saliva sample, however, revealed that the [petitioner's] blood type was in fact Type A and that he was a secretor. These results were consistent with the seminal stain found on the victim's bedspread. During the course of his investigation, Lombardo also belatedly learned from King that she had seen the [petitioner] walking his dog near the victim's apartment shortly after 7 p.m. on the night of the victim's death.

"Inconsistencies in the [petitioner's] version of his activities on the evening of March 8, 1987, and the [petitioner's] prescience that the victim had been sexually assaulted led Lombardo to become increasingly suspicious. Therefore, Lombardo again requested that the [petitioner] come to the police station on July 4, 1989. At that time the [petitioner] was interrogated and gave several incriminating oral and written statements to Lombardo, Detective Michael Morrissey and Brooks, respectively. Morrissey also interviewed the [petitioner's] wife on the same day, at which time she conceded that the [petitioner] had left their house on the night

of the victim's death in order to walk their dog. This was contrary to what both she and the [petitioner] had told the police previously, i.e., that the [petitioner] had not left the house after the family returned from their afternoon visit with the victim until the [petitioner] left after talking to Howard. On the basis of, among other evidence, the [petitioner's] admissions made on July 4, 1989, an arrest warrant was issued, pursuant to which the [petitioner] was taken into custody on July 5, 1989." Id., 696–702. The Supreme Court ultimately affirmed the petitioner's conviction. Id., 739.

Following the disposition of the petitioner's direct appeal, he instituted a habeas corpus proceeding. The petitioner, through habeas counsel Henry Theodore Vogt, filed his first petition for a writ of habeas corpus on May 30, 1997, alleging (1) newly discovered evidence regarding Dandy-Walker syndrome, a congenital brain disease afflicting the petitioner, (2) prosecutorial impropriety in the form of suppression of exculpatory evidence, (3) discrimination by the state on the basis of his mental and physical disabilities in violation of his rights to equal protection, (4) ineffective assistance of trial counsel and (5) ineffective assistance of appellate counsel.[1] On September 6, 2000, following a full hearing on the merits, the court, *Freed, J.*, dismissed the petition for a writ of habeas corpus. On January 22, 2002, this court affirmed the dismissal, and our Supreme Court subsequently denied the petition for certification to appeal. See *Lapointe* v. *Commissioner of Correction*, 67 Conn. App. 674, 789 A.2d 491, cert. denied, 259 Conn. 932, 793 A.2d 1084 (2002).

---

[1] After the close of evidence in the habeas trial but prior to judgment, attorneys W. James Cousins and Paul Casteleiro filed an appearance in lieu of Vogt. They sought to reopen the evidentiary proceedings; however, the court refused to consider the motions to reopen, finding their arguments to be beyond the scope of the proceeding. On appeal, this court affirmed this decision in *Lapointe* v. *Commissioner of Correction*, 67 Conn. App. 674, 678–79, 789 A.2d 491, cert. denied, 259 Conn. 932, 793 A.2d 1084 (2002).

Thereafter, in August, 2002, after obtaining new counsel, the petitioner filed his second petition for a writ of habeas corpus, alleging that he was denied his right to the effective assistance of habeas counsel. Specifically, he alleged that his previous habeas counsel, Vogt, failed to address issues concerning the suppression of exculpatory evidence, the ineffective assistance of trial counsel and the effect of newly discovered evidence relating to Dandy-Walker syndrome. These allegations comprised counts one through three, respectively, of the petitioner's second petition for a writ of habeas corpus.

A trial on this petition was conducted over the course of four days. After the close of the petitioner's case, the respondent, the commissioner of correction, made an oral motion for a judgment of dismissal. Pursuant to the agreement of the petitioner, the court, *Fuger, J.*, granted partial judgment of dismissal as to portions of counts one and two, and as to count three in its entirety. Thereafter, Judge Fuger issued a sixteen page memorandum of decision in which he granted the respondent's motion for a judgment of dismissal on the remaining counts, concluding that "no issues [remain] to be litigated in connection with the quality of the representation received by the petitioner that culminated in his 1992 conviction."[2] Additional facts will be set forth as necessary.

As an initial matter, we set forth the standard of review and the legal principles that guide our resolution

[2] Specifically, the court determined that the note that the petitioner claimed was suppressed improperly was not exculpatory evidence, and, therefore, his first habeas counsel's decision not to contest the suppression was not unreasonable. The court also reviewed the various allegations of trial counsel's deficient performance and concluded that the petitioner failed to establish that his first habeas counsel was deficient for not addressing trial counsel's failure (1) to call the petitioner's former wife, Karen Martin, as a witness, (2) to investigate adequately the possible burn time of the fire and secure an arson expert, (3) to consult a forensic pathologist to determine the victim's time of death and (4) to impeach the testimony of Morrissey.

of the petitioner's appeal from the judgment of dismissal. This case is different from a typical habeas appeal in that the court did not rule on the merits of the petitioner's claim; rather, it granted a motion for a judgment of dismissal after concluding that the petitioner failed to establish the prima facie elements of his claims. Practice Book § 15-8 provides in relevant part: "If, on the trial of any issue of fact in a civil matter tried to the court, the [petitioner] has produced evidence and rested, a [respondent] may move for judgment of dismissal, and the judicial authority may grant such motion if the [petitioner] has failed to make out a prima facie case. . . ." A prima facie case, in terms relevant to this case, "is one sufficient to raise an issue to go to the trier of fact. . . . In order to establish a prima facie case, the proponent must submit evidence which, if credited, is sufficient to establish the fact or facts which it is adduced to prove. . . . In evaluating a motion to dismiss, [t]he evidence offered by the plaintiff is to be taken as true and interpreted in the light most favorable to [the petitioner], and every reasonable inference is to be drawn in [the petitioner's] favor." (Citations omitted; internal quotation marks omitted.) *Thomas* v. *West Haven*, 249 Conn. 385, 392, 734 A.2d 535 (1999), cert. denied, 528 U.S. 1187, 120 S. Ct. 1239, 146 L. Ed. 2d 99 (2000). "Whether the [petitioner] has established a prima facie case entitling the [petitioner] to submit a claim to a trier of fact is a question of law over which our review is plenary." *DiStefano* v. *Milardo*, 276 Conn. 416, 422, 886 A.2d 415 (2005); *Sullivan* v. *Thorndike*, 104 Conn. App. 297, 302, 934 A.2d 827 (2007), cert. denied, 285 Conn. 907, 908, 942 A.2d 415, 416 (2008).

I

The petitioner first asserts that the court improperly dismissed his claim that his first habeas counsel rendered ineffective assistance by failing to allege a violation of his due process rights when the state suppressed

exculpatory evidence of an expert's opinion relating to the fire's burn time. The allegedly exculpatory opinion was contained in a note written by Detective Ludlow (Ludlow note), in which he purportedly summarized, within three days of the fire, a possible burn time of thirty to forty minutes. The petitioner claimed that this evidence depicts the window of time in which the fire was set, and, as he is able to account for his whereabouts during this specific window, it is his contention that this evidence demonstrated that it was impossible for him to have perpetrated the crimes. On appeal, the petitioner argues that the court failed to draw reasonable inferences from the evidence, viewed in the light most favorable to sustaining his claim, as is required on a motion for a judgment of dismissal.

The United States Supreme Court has held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady* v. *Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963); *State* v. *Walker*, 214 Conn. 122, 126, 571 A.2d 686 (1990). To establish a claim under *Brady*, the petitioner must establish that (1) the evidence allegedly suppressed was favorable to him, either because it was exculpatory or impeaching, (2) the evidence was suppressed by the state, either wilfully or inadvertently, and (3) prejudice resulted from its absence. *State* v. *Ortiz*, 280 Conn. 686, 717, 911 A.2d 1055 (2006).

In its memorandum of decision, the court found that the first prong of the *Brady* analysis was not satisfied because "[e]ven [when] viewed in the light most favorable to the petitioner, the evidence does not support a conclusion that Detective Ludlow's notes are favorable to the defense or exculpatory." In support of this conclusion, the court cited Ludlow's habeas trial testimony

in which he testified that the thirty to forty minute burn time referred to the absolute minimum amount of time that the fire could have been burning. The court then noted that even if the petitioner could account for his whereabouts during this window, he could not account for the complete time frame that the thirty to forty minute minimum burn time created. The court stated: "A neighbor had seen the victim alive at 5:30 p.m., and the fire was reported at 8:27 p.m. Detective Ludlow was crystal clear in his habeas trial testimony that the thirty to forty minutes in his notes referred to the *absolute minimum* amount of time that the fire had been burning, not the maximum. With thirty to forty minutes as the minimum amount of time that the fire could have been burning, a range of time can be established as the period in which the crime occurred: that is, between 5:30 p.m. [the last time the victim was seen alive] and approximately 7:50 p.m. [the latest possible time the fire could have been set in order for it to burn for the extreme end of the thirty to forty minute minimum window]. This window has significance only if the petitioner can verify his whereabouts during that time." Having found that the Ludlow note was not favorable to the petitioner's case, the court ruled that there was no basis to conclude that first habeas counsel's performance fell below an objective standard of reasonableness. See *Strickland* v. *Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

On appeal, the question for this court is whether the petitioner failed to make out a prima facie claim for a *Brady* violation; specifically, we must determine whether he failed to submit sufficient evidence to establish the exculpatory nature of the Ludlow note. "Exculpatory has been defined to mean [c]learing or tending to clear from alleged fault or guilt; excusing." (Internal quotation marks omitted.) *State* v. *Falcon*, 90 Conn. App. 111, 121, 876 A.2d 547, cert. denied, 275 Conn. 926,

883 A.2d 1248 (2005). Therefore, for the Ludlow note to be deemed exculpatory, the petitioner must have submitted evidence to demonstrate that the thirty to forty minute minimum burn time tended to clear him from alleged fault or guilt.

As the court noted in its memorandum of decision granting the motion for a judgment of dismissal, 7:50 p.m. represents the outer limits of the minimum burn time. The following additional evidence was submitted by the petitioner at the habeas proceeding to demonstrate the exculpatory nature of the Ludlow note and must be credited for the purposes of this court's analysis of whether the habeas court improperly granted the respondent's motion for a judgment of dismissal. A review of the record reveals evidence that the victim was last seen outside of her apartment by Howard at about 5:45 p.m. The petitioner's former wife, Karen Martin, testified at a suppression hearing that she prepared dinner at the petitioner's home and that they ate dinner at about 5:15 p.m. or 5:30 p.m. Prior to sitting down for dinner, the petitioner had walked the family dog for approximately twenty minutes. Therefore, according to her testimony, the petitioner had returned from his walk before the time that the victim was last seen outside of her apartment. Karen Martin, further testified that he did not leave their house again until she received a telephone call from Howard, who requested that the petitioner walk over to the victim's house to check on her. According to Howard, this telephone call was placed a little after 8 p.m. Prior to this telephone call, the petitioner was not always in his wife's sight. In particular, she was upstairs bathing her son from approximately 6:15 to 7 p.m.; however, she testified at the second habeas proceeding that while she was upstairs, it was possible to hear someone downstairs. From 7 p.m. until the time the petitioner left to check on the victim at the request of Howard, he was

watching television with his family.[3] The fire was reported by the petitioner at approximately 8:27 p.m.

Viewing this evidence in the light most favorable to the petitioner, we conclude that he submitted sufficient evidence to establish the prima facie basis for the exculpatory nature of the Ludlow note. As noted by the court, the thirty to forty minute minimum burn time, if credited as an accurate estimation, establishes that the fire was set at or before 7:50 p.m. The petitioner submitted evidence that, if credited, can account for his whereabouts, albeit tenuously, for the full window of time encompassing the last time the victim was seen alive outside her apartment to the time her body was discovered. Evidence that tends to prove his temporal inability to have committed the crime satisfies the definition of exculpatory and, therefore, is sufficient to establish the first prima facie element of a *Brady* claim. As the court's decision to grant the motion for a judgment of dismissal was premised on its conclusion that this prima facie element was not established,[4] we conclude that the motion for a judgment of dismissal was granted improperly as to this portion of count one.

[3] In its brief, the respondent argues that Karen Martin testified at the second habeas petition that "[the petitioner] was not in the house" but nevertheless also testified that she was truthful on previous occasions when she testified as to his whereabouts, a statement that appears to be contradictory. A review of her testimony, however, reveals the proper context in which she made this statement. She testified that the petitioner was not in the house because he had gone to her grandmother's to check on her. She then related what she did during the petitioner's absence. It is undisputed that the petitioner was at the victim's apartment, having been the person who called the police. Therefore, her second habeas trial testimony does not contradict her previous testimony as the respondent seems to argue.

[4] The court did not engage in an analysis of whether prior habeas counsel's performance was deficient, having determined that the petitioner had failed to establish a prima facie *Brady* violation. The court concluded: "Without evidence that Detective Ludlow's note is favorable to the petitioner, it would have been pointless for [habeas counsel] to raise a *Brady* claim in the petitioner's first habeas action. There is, therefore, no basis upon which this court can find that [habeas counsel's] performance fell below an objective standard of reasonableness."

## II

We next address the petitioner's assertion that the court improperly dismissed his claim of ineffective assistance of habeas counsel. Count two of the second habeas petition alleges that his first habeas counsel failed to raise several issues of ineffective assistance of trial counsel during the first habeas proceeding. Specifically, the petitioner claims that his first habeas counsel should have alleged the following instances of ineffective assistance of trial counsel: (1) the failure to present testimony of an arson expert concerning the fire's burn time; (2) the failure to employ available evidence to establish the unreliability of the petitioner's confession; and (3) the decision to allow the petitioner to testify during the guilt phase of his trial. On appeal, the petitioner argues that the court, *Fuger, J.*, failed either to review his claims or to evaluate them properly. For the claims that were decided, the petitioner argues that the court failed to accord him all favorable inferences as required when evaluating a motion for a judgment of dismissal and made erroneous findings of fact unsupported by the record.

As the remaining claims are based on ineffective assistance of counsel, we begin our analysis by setting forth the familiar two part test enunciated by the United States Supreme Court in *Strickland* v. *Washington*, supra, 466 U.S. 687. "In *Strickland*, which applies to claims of ineffective assistance during criminal proceedings generally, the United States Supreme Court determined that the claim must be supported by evidence establishing that (1) counsel's representation fell below an objective standard of reasonableness, *and* (2) counsel's deficient performance prejudiced the defense because there was a reasonable probability that the outcome of the proceedings would have been different

had it not been for the deficient performance." (Emphasis in original; internal quotation marks omitted.) *Johnson* v. *Commissioner of Correction*, 285 Conn. 556, 575, 941 A.2d 248 (2008). "The first prong is satisfied by proving that counsel made errors so serious that he was not functioning as the 'counsel' guaranteed by the sixth amendment. The second prong is satisfied if it is demonstrated that there exists a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Russell* v. *Commissioner of Correction*, 49 Conn. App. 52, 53, 712 A.2d 978, cert. denied, 247 Conn. 916, 722 A.2d 807 (1998), cert. denied sub nom. *Russell* v. *Armstrong*, 525 U.S. 1161, 119 S. Ct. 1073, 143 L. Ed. 2d 76 (1999).

"[When] applied to a claim of ineffective assistance of prior habeas counsel, the *Strickland* standard requires the petitioner to demonstrate that his prior habeas counsel's performance was ineffective and that this ineffectiveness prejudiced the petitioner's prior habeas proceeding. . . . [T]he petitioner will have to prove that one or both of the prior habeas counsel, in presenting his claims, was ineffective and that effective representation by habeas counsel establishes a reasonable probability that the habeas court would have found that he was entitled to reversal of the conviction and a new trial . . . ." *Harris* v. *Commissioner of Correction*, 108 Conn. App. 201, 209–10, 947 A.2d 435, cert. denied, 288 Conn. 911, 953 A.2d 652 (2008). Therefore, as explained by our Supreme Court in *Lozada* v. *Warden*, 223 Conn. 834, 613 A.2d 818 (1992), a petitioner claiming ineffective assistance of habeas counsel on the basis of ineffective assistance of trial counsel must essentially satisfy *Strickland* twice: he must "prove both (1) that his appointed habeas counsel was ineffective, *and* (2) that his trial counsel was ineffective." (Emphasis added.) Id., 842; see also *Denby* v. *Commissioner of Correction*, 66 Conn. App. 809, 812–13, 786

A.2d 442 (2001), cert. denied, 259 Conn. 908, 789 A.2d 994 (2002).

Furthermore, for any ineffective assistance claim, we also are cognizant that "the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances." (Internal quotation marks omitted.) *Johnson* v. *Commissioner of Correction,* supra, 285 Conn. 577. "Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a [petitioner] to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [petitioner] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. . . . There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." (Citations omitted; internal quotation marks omitted.) *Strickland* v. *Washington,* supra, 466 U.S. 689.

We now address each of these claims in turn, mindful that the petitioner's claims related to his habeas counsel must fail if the claims of ineffective assistance of trial counsel are unavailing. See *Lozada* v. *Warden,* supra, 223 Conn. 842–43.

A

Burn Time-Arson Expert

The petitioner first claims that he received ineffective assistance of habeas counsel because habeas counsel alleged a claim for ineffective assistance of trial counsel but did not include a claim regarding trial counsel's failure to investigate the fire's burn time.

In its memorandum of decision, the court initially noted that "Vogt admitted that he did not hire an arson expert for the petitioner's first habeas matter; however, he was not asked to explain why he did not do so." After reviewing the petitioner's evidence in support of this claim, the court then concluded that "[t]here is simply no proof that hiring an arson expert to investigate the fire's burn time would, in any way, have rendered the result of the first habeas trial unreliable." This conclusion was predicated on the court's prior conclusion that the burn time did not establish an alibi defense. Accordingly, the court determined that the petitioner's claim for ineffective assistance of habeas counsel failed on both prongs of *Strickland.* Having reached this conclusion, the court did not engage in an analysis of the claim as it related to trial counsel.

We already have concluded that there was sufficient evidence presented at the second habeas proceeding to establish the potential exculpatory nature of a burn time estimation because evidence was submitted that, if credited, tenuously would have established an alibi for the window of time created by this burn time estimation. Furthermore, the petitioner submitted additional evidence of a burn time estimation through the habeas testimony of an arson expert, Gerald Kelder, who testified that the fire lasted for a period of time between forty-five minutes and one hour. This estimation, if credited, would narrow the window of time necessitating an alibi because it served to set the outer limits of the

window created by the minimum burn time estimation appearing in the Ludlow note. Taken as a collective whole, this evidentiary submission, if credited and afforded all reasonable inferences, is sufficient to establish the prejudice prong of *Strickland* for the broad purposes of our review of a motion for a judgment of dismissal.

As the court's decision to grant the motion for a judgment of dismissal was premised on its conclusion that the petitioner did not establish that he was prejudiced by his first habeas counsel's failure to present an arson expert,[5] we conclude that the motion for a judgment of dismissal was improperly granted as to this portion of count two.

### B

### Failure to Employ Evidence

The petitioner next argues that the court failed to consider his claims arising from habeas counsel's failure to allege deficient trial representation for not utilizing evidence to prove the factual unreliability of the

---

[5] In the memorandum of decision, the court noted that prior habeas counsel did not provide any explanation as to why he did not hire an arson expert and that this omission is problematic when determining the deficient performance prong of the *Strickland* analysis. The court, however, did not reach this stage of the analysis after concluding that the petitioner did not establish the first prong of *Strickland*. Furthermore, under the particular facts of this case, it would appear that we cannot conduct a meaningful review of a court's decision to render a judgment of dismissal on this claim. Specifically, our review of the court's judgment of dismissal requires us to review the proffered evidence in the light most favorable to the petitioner to determine whether he has established a prima facie showing of a *Strickland* claim; see *Thomas* v. *West Haven*, supra, 249 Conn. 392; however, due to the lack of a definitive description of what constitutes "deficient performance," we are also required to evaluate the specific circumstances of the claim and indulge a strong presumption in favor of finding that the representation was not deficient. See *Henderson* v. *Commissioner of Correction*, 80 Conn. App. 499, 504, 835 A.2d 1036 (2003), cert. denied, 267 Conn. 918, 841 A.2d 1190 (2004).

petitioner's inculpatory statements to the police.[6] Specifically, regarding the latter claim, the petitioner argues that trial counsel failed to utilize evidence of (1) the clothes worn by the victim at the time of the attack, (2) the discovery of pubic hair belonging to an unknown individual that was found on the victim's sweater, (3) the existence of gloves at the crime scene that had no connection to the petitioner or the victim, (4) the method of strangulation that did not correlate to the petitioner's confession and (5) the location of the stabbing that did not correlate to the petitioner's confession.

The court did not address the merits of these claims; however, a review of the memorandum of decision indicates that these claims were denied albeit without explanation. See *Madagoski* v. *Commissioner of Correction*, 104 Conn. App. 768, 771–72 n.1, 936 A.2d 247 (2007) (concluding that despite habeas court's failure to address three counts of habeas petition expressly, all counts nevertheless disposed of because court denied entire petition, thereby rendering final judgment), cert. denied, 286 Conn. 905, 944 A.2d 979 (2008). As the current appeal arises from a decision to grant the respondent's motion for a judgment of dismissal, our review of these claims is plenary. See *DiStefano* v. *Milardo*, supra, 276 Conn. 422.

It should also be noted from the outset of this analysis that the five issues raised have the potential to act in a cumulative capacity to attack the credibility of the

---

[6] We note that the petitioner's failure to file a motion for articulation in the event that a court did not address the merits of his claims normally would preclude our review on the basis of an inadequate record. See *Schoonmaker* v. *Lawrence Brunoli, Inc.*, 265 Conn. 210, 232, 828 A.2d 64 (2003) (stating well established principle that it is appellant's burden to provide adequate record for review). In light of the fact that this court has plenary review over the decision to grant a motion for a judgment of dismissal; see *DiStefano* v. *Milardo*, supra, 276 Conn. 422; an adequate record exists to determine whether the petitioner submitted sufficient evidence to survive the motion underlying this appeal.

petitioner's confession in a way that carries more weight than any one issue alone; accordingly, they are best addressed in the aggregate.

The first issue concerns trial counsel's failure to employ available evidence that the clothes worn by the victim at the time of the attack did not match the petitioner's description of what she was wearing when he confessed to attacking her. At the second habeas trial, the petitioner submitted evidence, by way of investigation reports, crime scene photographs and the testimony of Ludlow to establish the articles of clothing found at the crime scene, which included black pants, a blue sweater and a multicolor blouse. The petitioner also submitted the police report detailing Howard's statement that she last saw the victim outside of the victim's apartment wearing a blue sweater and dark slacks. Howard's testimony at various stages of the underlying proceedings reiterated this statement. When this evidence is compared with the petitioner's confession, a clear contradiction arises. In a written statement, the petitioner stated the following: "I went into the bathroom (which is located off the bedroom). When I came out [the victim] was wearing a pink house coat type of outer wear with no bra. (I could see her breasts when she bent over)." The petitioner argues that the evidence of the specific articles of clothing found at the crime scene, in particular the absence of this pink housecoat, is indicative of the unreliability of his confession. Accordingly, he argues that his trial counsel provided ineffective representation by not utilizing this evidence to undermine the credibility of his confession.

The next issue involves the discovery of pubic hair belonging to an unknown individual that was found on the victim's sweater. The plaintiff submitted evidence by way of the evidence report and the complete criminalistics report to demonstrate that his counsel was aware that pubic hair not belonging to the victim or to

the petitioner was discovered on the victim's sweater. He argues that this evidence demonstrates, at least circumstantially, that the pubic hair belonged to the perpetrator and that it was transferred to the victim's sweater at the time of the attack. Accordingly, it is his contention that he received inefficient assistance of trial counsel because his counsel failed to employ this evidence to demonstrate that he was not the perpetrator of this crime.

The third issue concerns the existence of gloves at the crime scene that had no connection to the petitioner or the victim. The petitioner submitted evidence that a pair of men's gloves were discovered at the crime scene. One glove was located at the head of the victim's bed while the other was discovered on the floor of the bedroom. The criminalistics report was submitted to establish that the victim's head hair was discovered on both gloves. The crime scene photographs were submitted to substantiate this claim, as well as excerpts from the trial court transcript, the evidence report and the criminalistics report. He maintains that this evidence establishes that the gloves have no evidentiary connection to him, and, therefore, the gloves' appearance at the crime scene should have been employed by his trial counsel to demonstrate, even circumstantially, that the gloves belonged to the actual perpetrator.

The fourth issue concerns trial counsel's failure to employ evidence that the method of strangulation utilized by the perpetrator contradicts the method described by the petitioner in his confession. According to the written confession issued in the presence of Morrissey, the petitioner stated: "I admit to having strangled her." At the criminal trial, Morrissey testified that when the petitioner made this statement, he made a motion with his hands to demonstrate. Morrissey testified that "he brought up his hands and opened palms the way you'd expect somebody to be grabbing somebody's

neck." The medical examiner, Arkady Katsnelson, however, testified at trial that "with reasonable degree of medical certainty in this particular case, I believe this asphyxiation was caused by pressure with a blunt object, to the right side of the neck. It is not manual strangulation." The petitioner maintains that this is evidence of inadequate trial representation because his counsel failed to address this contradiction, which would have demonstrated the unreliability of the petitioner's confession to Morrissey.

The last evidentiary issue also involves trial counsel's alleged failure to utilize existing evidence to undermine the reliability of the petitioner's confession due to a factual inconsistency between the evidence adduced at trial and the substance of the confession. According to the petitioner's confession, after the victim was sexually assaulted, "she said she was going to tell my wife Karen. I then went to the kitchen and got a steak knife with a hard plastic brown handle and stabbed [the victim] in the stomach while she was laying on the couch." Notwithstanding this recounting of the events, the petitioner argues that the forensic evidence adduced at trial demonstrated that the stabbing did not occur on the couch; rather, the victim was stabbed in the bedroom. The petitioner submitted numerous crime scene photographs of both the bedroom and the couch in support of this claim. He argues that his trial counsel failed to address this contradiction even though it demonstrates the unreliability of his statement to Morrissey.

Each of these claims involving trial counsel's failure to employ the available evidence addresses either the credibility of the petitioner's confession or the likelihood of a different perpetrator. Evidence of this nature has a reasonable probability of altering the outcome of the proceedings. Therefore, viewing the evidence in the light most favorable to the petitioner, we conclude that

he has submitted sufficient evidence to establish a prima facie showing of prejudice under *Strickland*.

We turn next to the question of whether the petitioner submitted sufficient evidence to demonstrate a prima facie showing that trial counsel's performance was deficient. "While it is incumbent on a trial counsel to conduct a prompt investigation of the case and explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction . . . counsel need not track down each and every lead or personally investigate every evidentiary possibility. . . . In a habeas corpus proceeding, the petitioner's burden of proving that a fundamental unfairness had been done is not met by speculation, but by demonstrable realities. . . . One cannot successfully attack, with the advantage of hindsight, a trial counsel's trial choices and strategies that otherwise constitutionally comport with the standards of competence." (Internal quotation marks omitted.) *Torres* v. *Commissioner of Correction*, 84 Conn. App. 561, 566–67, 854 A.2d 97 (2004). Here, the totality of the evidence submitted to demonstrate trial counsel's failure to employ available evidence is sufficient to establish a prima facie showing of prejudice under *Strickland*. This evidence, if credited and viewed in the light most favorable to the petitioner, is substantial enough to take his claim out of the realm of speculation and make the issue of fundamental unfairness a demonstrable reality. Accordingly, the court improperly granted the motion for a judgment of dismissal on this portion of count two.

C

Petitioner's Testimony

The final claim asserted by the petitioner is that his prior habeas counsel provided deficient representation in failing to present a claim arising out of trial counsel's allegedly improper decision to allow the petitioner to

testify during the guilt phase of the underlying criminal trial. This portion of count two was denied by the court without explanation.

At the second habeas proceeding, the petitioner elicited the following relevant testimony from attorney Patrick J. Culligan. "The theory of our defense was to try to persuade the jury that [the petitioner] was the victim of an intentional police investigation that was designed to take advantage of his mental and emotional limitations and that they should therefore give no credence to his confessions." Specifically, regarding his decision to allow the petitioner to testify, Culligan testified that he was aware that the petitioner could be impeached; however, "[h]aving him testify to the jury in the guilt phase of the trial would give the jury an opportunity to view him as a human being and as we hoped, a person with limited intellectual, cognitive abilities, and if in fact they had to make a decision about whether he should be sentenced to death or life imprisonment, that the experience of having him testify would tend to encourage them and make it easier for them to vote for a life sentence."

The petitioner does not submit any evidence to establish that he was prejudiced by trial counsel's decision to have him testify. In his brief, he merely cites testimony establishing trial counsel's awareness that the petitioner was prone to impeachment. Trial counsel's use of this knowledge, however, was explained as part of a specific trial strategy. Therefore, even viewing this evidence in the light most favorable to the petitioner, there is insufficient evidence to substantiate his claim. Absent evidence of prejudice, he is unable to make out a prima facie case for a *Strickland* claim. Accordingly, we conclude that the habeas court properly granted the motion for a judgment of dismissal as it relates to this claim.

The judgment is reversed as to count one as it relates to the Ludlow note and as to those portions of count two concerning trial counsel's failure to utilize evidence to prove the factual unreliability of the petitioner's inculpatory statements to the police, and the case is remanded for further proceedings according to law. The judgment is affirmed in all other respects.

In this opinion the other judges concurred.