******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ERIC HAM *v.* COMMISSIONER OF CORRECTION
(AC 34758)

Beach, Sheldon and West, Js.

*Argued April 17—officially released August 12, 2014*

(Appeal from Superior Court, judicial district of
Tolland, Newson, J.)

*Peter G. Billings*, assigned counsel, for the appellant (petitioner).

*Mitchell S. Brody*, senior assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *David Clifton*, assistant state's attorney, for the appellee (respondent).

*Opinion*

BEACH, J. The petitioner, Eric Ham, appeals following the denial of his petition for certification to appeal from the judgment of the habeas court denying his amended petition for a writ of habeas corpus. The petitioner claims that the court abused its discretion in denying his petition for certification to appeal. He substantively argues that the court (1) erred in denying his claim that his trial counsel rendered ineffective assistance by failing to consult a ballistics expert, and (2) improperly granted the motion to dismiss of the respondent, the Commissioner of Correction, pursuant to Practice Book § 15-8 on the ground that he had not established a prima facie case to support his claims of ineffective assistance of appellate counsel and of prior habeas counsel. We dismiss the petitioner's appeal.

The facts underlying the petitioner's conviction were set forth as follows in his direct appeal. "[I]n March, 1993, the [petitioner], accompanied by four masked men, approached Alex Santana and asked him where to find his cousin, George Flores. When Santana replied that he had not seen Flores, the [petitioner] punched Santana in the face, causing him to be thrown against a store window. The owner of the store came outside and the [petitioner] and his companions departed. On May 5, 1993, at approximately 11 p.m., the [petitioner] agreed to pay Ronaldo Rivera $40 if he would steal a large, fast, four door automobile and deliver it to the [petitioner]. Rivera found such a vehicle on Frank Street in New Haven and, with the help of a friend, stole a four door Buick and brought the car to the [petitioner] and another man on Ward Street at approximately 2 a.m.

"Santana had been riding that night in the car of his friend, Butch Console, with three other persons, Marilyn Torres, Melissa Dawson and Dimiris Vega. When the car stopped on Button Street, the occupants got out. As they were standing by the car, a man approached and offered to paint Console's initials on the driver's door. Console agreed and then stood next to a red station wagon parked on the opposite side of the street. Meanwhile, his friends stood on the street side of Console's car watching the man paint. Console noticed a car approaching slowly on Button Street. He saw what he first thought were firecrackers coming from the rear seat of the car. When he realized it was gunfire, Console ran around the front of the station wagon to the sidewalk and knelt to avoid the bullets. The approaching car was the stolen Buick and contained the [petitioner] and three companions. Gunfire erupted from the area of the rear seat of the Buick. One bullet hit Santana in the stomach, resulting in his hospitalization. Another bullet struck Torres in the back, causing her death. The evidence indicated that at least five shots were fired from close range.

"A few minutes later, the [petitioner] and his companions crashed the Buick on Howard Avenue and abandoned it with the motor running, the rear door open, a bullet casing on the floor behind the driver's seat, and a sheet covering the rear seat wet with blood. The rear window had been blown out. A second shell was found on the roof of the car, and a third was found on Button Street at the shooting scene. The [petitioner] went to the Hospital of St. Raphael (hospital) at 2:49 a.m. to seek treatment for a gunshot wound. He spoke with a New Haven police officer at 3:05 a.m. He gave a statement to Sergeant Diane Langston declaring that he and his friend had been accosted and shot on the street in an attempted robbery by two masked men. The [petitioner] stated that he and his friend then ran directly to the hospital.

"A ballistics expert testified that the bullet obtained from Torres' body matched the .45 caliber shell casing found on the floor of the Buick. The other casings found on the roof of the Buick and on Button Street came from a nine millimeter gun. A fingerprint expert identified fingerprints found on the interior of the driver's door as those of the [petitioner]. Experts from the state forensic laboratory testified that the blood on the sheet covering the back seat was consistent with the [petitioner's] blood type." *State* v. *Ham*, 55 Conn. App. 281, 283–85, 739 A.2d 1268, cert. denied, 252 Conn. 916, 743 A.2d 1128 (1999).

Following a jury trial, the petitioner was convicted of conspiracy to commit larceny in the third degree in violation of General Statutes §§ 53a-48 (a) and 53a-124 (a) (1), larceny in the third degree in violation of § 53a-124 (a) (1), conspiracy to commit murder in violation of General Statutes §§ 53a-48 and 53a-54a (a), murder in violation of § 53a-54a (a), assault in the first degree in violation of General Statutes § 53a-59, and falsely reporting an incident in violation of General Statutes § 53a-180 (a) (3) (A). Id., 282–83. The petitioner was sentenced to fifty years incarceration. His conviction was affirmed on direct appeal. Id., 283.

The petitioner filed a prior petition for a writ of habeas corpus in 2005, alleging ineffective assistance of trial counsel on various grounds. The habeas court denied the petition, and our Supreme Court affirmed the judgment of the habeas court.[1] *Ham* v. *Commissioner of Correction*, 301 Conn. 697, 23 A.3d 682 (2011).

The petitioner filed the petition that is the subject of this appeal in 2011. In his petition, he alleged ineffective assistance of trial counsel, appellate counsel and habeas counsel, in connection with the 2005 petition. After the petitioner presented his case at the habeas trial, the respondent moved pursuant to Practice Book § 15-8 to dismiss counts two and three of the petition, which alleged ineffective assistance of appellate and

habeas counsel, respectively, for failure to present a prima facie case. The court granted the motion concluding that the petitioner had failed to present evidence as to those claims. After the respondent presented evidence as to the first count, the court issued a memorandum of decision in which it denied the petition, reasoning that the petitioner had failed to meet his burden of establishing that his trial counsel was constitutionally ineffective for failing to consult a ballistics expert and that this failure prejudiced the petitioner. The court denied the petition for certification to appeal. This appeal followed.

The petitioner first claims that the court erred in denying his petition for certification to appeal because the issues presented were debatable among jurists of reason. We begin with the following well established standard of review. "Faced with the habeas court's denial of certification to appeal, a petitioner's first burden is to demonstrate that the habeas court's ruling constituted an abuse of discretion. . . . A petitioner may establish an abuse of discretion by demonstrating that the issues are debatable among jurists of reason . . . [the] court could resolve the issues [in a different manner] . . . or . . . the questions are adequate to deserve encouragement to proceed further. . . . The required determination may be made on the basis of the record before the habeas court and applicable legal principles. . . . [See] *Simms* v. *Warden*, 230 Conn. 608, 612–18, 646 A.2d 126 (1994).

"In determining whether the habeas court abused its discretion in denying the petitioner's request for certification, we necessarily must consider the merits of the petitioner's underlying claims to determine whether the habeas court reasonably determined that the petitioner's appeal was frivolous. In other words, we review the petitioner's substantive claims for the purpose of ascertaining whether those claims satisfy one or more of the three criteria . . . adopted by this court for determining the propriety of the habeas court's denial of the petition for certification. Absent such a showing by the petitioner, the judgment of the habeas court must be affirmed." (Citation omitted; internal quotation marks omitted.) *Koslik* v. *Commissioner of Correction*, 127 Conn. App. 801, 804–805, 16 A.3d 753, cert. denied, 301 Conn. 913, 19 A.3d 1259 (2011). In order to determine whether the court abused its discretion in denying the petition for certification to appeal, we must consider the merits of the petitioner's underlying claims, which we will do in turn.

I

The petitioner claims that the court erred in concluding that his trial counsel, William Dow, rendered effective assistance. He argues that Dow's performance was ineffective because he failed to consult with a firearms and toolmark expert and, as a result, his cross-examina-

tion of James Stephenson, the state's firearms identification expert, was ineffective. The petitioner contends that if Dow had consulted with a firearms identification expert, he would have been able to highlight deficiencies in Stephenson's testimony. The petitioner's claimed vulnerable points include the subjectivity involved in the field of firearms identification, the lack of peer review in Stephenson's work, and the inability to determine whether the bullet found in the victim was fired from the shell casing found in the car from which the fatal shots were fired. He argues that he was prejudiced because the firearms evidence was the only physical evidence purportedly linking the petitioner to the scene of the crime. We are not persuaded.

At the criminal trial, Stephenson testified on direct examination that more than one handgun had been used, that the casing found on the roof of the Buick and the casing found in front of 50-52 Button Street were both nine millimeter casings that had been fired from the same firearm, that the bullet found in the victim's body was a .45 caliber bullet, and that the shell casing found on the floor of the rear seat area of the Buick had not been fired from a nine millimeter handgun because the diameter of the cartridge was too large for a nine millimeter handgun. When asked if there were any means available for determining if a bullet had come from a particular cartridge or particular casing, Stephenson answered, "[t]here's no identification process to put a fired bullet directly back into a fired cartridge case, it would only be a class characteristic."

On cross-examination, Stephenson testified that he could not determine in this case if anything had been fired from a particular firearm or who had fired what weapon. He could not tell when the firearms were fired. His ability to determine whether any particular firearm had shot a particular bullet was limited because no firearms had been submitted for examination.

At the habeas trial, Dow testified that he did not consult a firearms expert before trial because the petitioner's fingerprint and blood evidence were found in the Buick. The importance of the subjective and less definitive match between the bullet found in the victim's body and the casing found in the Buick was, thus, of less importance. He testified that his "theory would've had to have been it could've gotten there at any time, he wasn't necessarily in the car at the time of the shooting. That's the way I chose, tactically, to go. . . . [P]ulling the ballistics piece out of the puzzle wasn't going to solve the problem. I still had the prints and the blood." He testified that his trial tactic was to limit the impact of the "toolmark" identification testimony and to distance the evidence of the petitioner's blood and fingerprints as well as the shell casing found in the Buick from the events of the night at issue. He further testified that it was unlikely that Stephenson would have backed down

from his conclusions if Dow had questioned him on the subjective nature of his comparisons.

Stephenson testified at the habeas trial that his work was not reviewed by any other individual, that the bullet found in the victim's body was a .45 caliber bullet, and that the shell casing found on the floor of the rear seat area of the Buick had been fired from a .45 caliber firearm. He further testified that there was no method to determine if the bullet found in the victim's body had been fired from the cartridge case found in the Buick. He further testified that there had "probably been over fifty validation studies of the science itself to determine that we can make this statement that we know that the marks left upon the surface of two objects by the same tool can be identified to each other. . . . I, myself, have participated in several of these validation studies to prove to myself that the science is what it does. . . . Knowing the fact that two objects marked by the same tool leave the same marks and once they're examined by a . . . qualified examiner, they'll come to the same results if they were viewed by another . . . competent and qualified examiner . . . that's the practical certainty."

"[W]e begin our analysis by setting forth the familiar two part test enunciated by the United States Supreme Court in *Strickland* v. *Washington*, [466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)]. In *Strickland*, which applies to claims of ineffective assistance during criminal proceedings generally, the United States Supreme Court determined that the claim must be supported by evidence establishing that (1) counsel's representation fell below an objective standard of reasonableness, and (2) counsel's deficient performance prejudiced the defense because there was a reasonable probability that the outcome of the proceedings would have been different had it not been for the deficient performance. . . . The first prong is satisfied by proving that counsel made errors so serious that he was not functioning as the counsel guaranteed by the sixth amendment. The second prong is satisfied if it is demonstrated that there exists a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (Emphasis omitted; internal quotation marks omitted.) *Edwards* v. *Commissioner of Correction*, 141 Conn. App. 430, 437–38, 63 A.3d 540, cert. denied, 308 Conn. 940, 66 A.3d 882 (2013).

"A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reason-

able professional assistance; that is, the [petitioner] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. . . . [C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. . . . An attorney's line of questioning on examination of a witness clearly is tactical in nature. [As such, this] court will not, in hindsight, second-guess counsel's trial strategy." (Citation omitted; internal quotation marks omitted.) *Antonio A*. v. *Commissioner of Correction*, 148 Conn. App. 825, 829–32, 87 A.3d 600, cert. denied, 312 Conn 189,     A.3d    (2014).

After reviewing the record, we agree with the habeas court's conclusion that Dow's cross-examination of Stephenson did not constitute deficient performance.[2] Dow testified that his trial strategy was to focus on the fingerprints and the blood and to disassociate the petitioner with the Buick at the time of the shooting. Furthermore, Stephenson had already testified on direct examination at the criminal trial that he could not "put a fired bullet directly back into a fired cartridge case." Additionally, if Dow had questioned Stephenson about the subjective nature of his comparisons, he would have run the risk that Stephenson would have testified, as he did at the habeas hearing, about the validation studies and the "practical certainty" of his comparisons. We conclude that the petitioner has failed to overcome the presumption that Dow's cross-examination of Stephenson represented a sound trial strategy. See, e.g., *William B*. v. *Commissioner of Correction*, 128 Conn. App. 478, 493, 17 A.3d 522, cert. denied, 302 Conn. 912, 27 A.3d 371 (2011).

We conclude that the court did not err in denying the petition for certification to appeal as to this claim. The petitioner has not demonstrated that the issue was debatable among jurists of reason, that a court could resolve the issue in a different manner, or that the questions raised deserve encouragement to proceed further.

## II

The petitioner next claims that the court erred in dismissing the second and third counts of the habeas petition pursuant to Practice Book § 15-8 for the petitioner's failure to establish a prima facie case of ineffective assistance of counsel. In counts two and three, respectively, the petitioner alleged that his counsel on direct appeal was ineffective for failing to challenge the trial court's instruction on motive on the ground that the court had improperly marshalled evidence in favor of the state, and that his counsel in the first habeas proceeding was ineffective for failing to claim that his counsel on direct appeal was ineffective for failing to challenge the trial court's instruction on motive. We

are not persuaded.

The following additional facts are relevant to this claim. At the close of the petitioner's case in the habeas proceeding, the respondent moved to dismiss counts two and three pursuant to Practice Book § 15-8 for failure to make out a prima facie case. The court granted the motion. The court reasoned, with respect to both counts, that no evidence had been presented to establish a prima facie case. Although transcripts of the criminal trial had been provided, there was no testimony at the habeas trial regarding standards to be applied or the thought process of the petitioner's counsel.

The following principles guide our review of the petitioner's claim. Practice Book § 15-8 provides, in relevant part, that "[i]f, on the trial of any issue of fact in a civil matter tried to the court, the [petitioner] has produced evidence and rested, [the respondent] may move for judgment of dismissal, and the judicial authority may grant such motion if the [petitioner] has failed to make out a prima facie case. . . ." "A prima facie case . . . is one sufficient to raise an issue to go to the trier of fact. . . . In order to establish a prima facie case, the proponent must submit evidence which, if credited, is sufficient to establish the fact or facts which it is adduced to prove. . . . In evaluating a motion to dismiss, [t]he evidence offered by the [petitioner] is to be taken as true and interpreted in the light most favorable to [the petitioner], and every reasonable inference is to be drawn in [the petitioner's] favor. . . . Whether the [petitioner] has established a prima facie case entitling the [petitioner] to submit a claim to a trier of fact is a question of law over which our review is plenary." (Citation omitted; internal quotation marks omitted.) *Lapointe* v. *Commissioner of Correction*, 113 Conn. App. 378, 388, 966 A.2d 780 (2009).

A

We first turn our attention to the court's dismissal of count two, which alleged ineffective assistance of the petitioner's appellate counsel for failure to raise on appeal a claim that the trial court improperly marshalled evidence in favor of the state in its instruction on motive. "Our Supreme Court has adopted [the] two part analysis [set forth in *Strickland* v. *Washington*, supra, 466 U.S. 687] in reviewing claims of ineffective assistance of appellate counsel. . . . To prevail on a claim of ineffective assistance of counsel, a petitioner must show (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced the defense. . . . First, deficient performance may be proved by showing that the counsel's representation fell below an objective standard of reasonableness. . . . Second, prejudice to the defense requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. . . . [T]he [prejudice] prong considers whether there is

a reasonable probability that, but for appellate counsel's failure . . . the petitioner would have prevailed in his direct appeal, i.e., reversal of his conviction or granting of a new trial. . . . [T]o determine whether a habeas petitioner had a reasonable probability of prevailing on appeal, a reviewing court necessarily analyzes the merits of the underlying claimed error in accordance with the appropriate appellate standard for measuring harm." (Citations omitted; internal quotation marks omitted.) *Rogers* v. *Commissioner of Correction*, 143 Conn. App. 206, 210–11, 70 A.3d 1068 (2013).

This case is unusual in that the only evidence that the petitioner submitted in support of count two was the trial transcript, which included the court's instructions to the jury.[3] We assume in some circumstances that it may be possible that a trial transcript alone could suffice to establish a prima facie case of ineffective assistance of appellate counsel, where, for example, the record revealed a potentially meritorious claim for appeal. In this case, however, the trial transcript alone was insufficient because it does not reveal a meritorious claim. If the claim is facially lacking a reasonable chance of success on appeal, then counsel could not be ineffective in failing to pursue it.[4] See *Bailey* v. *Commissioner of Correction*, 107 Conn. App. 362, 366–67, 947 A.2d 2 ("[i]f the issues not raised by his appellate counsel lack merit, [the petitioner] cannot sustain even the first part of [his] dual burden since the failure to pursue unmeritorious claims cannot be considered conduct falling below the level of reasonably competent representation" [internal quotation marks omitted]), cert. denied, 287 Conn. 922, 951 A.2d 568 (2008).

The trial transcript reveals that the trial court's instruction on motive was not improper. The court instructed the jury regarding motive as follows: "In this case, the state claims that there was at least one motive for the [petitioner] to commit the crimes charged, that being the dispute between the [petitioner] and Alex Santana, and the state contends there was evidence to show that about two months prior to . . . May [6, 1993] that the [petitioner] and some associates of his approached Mr. Santana and physically assaulted him when he would not divulge the whereabouts of his cousin, I believe. This testimony was introduced by the state to establish and corroborate what the state claims was the [petitioner's] motive to commit the crimes charged here. Additionally, the state claims that the motive for stealing a 1984 Buick belonging to Mr. Alejo Rivera was to obtain a vehicle for use in the commission of the shooting on Button Street. The jury should examine the conduct of an accused in the light of the surrounding circumstances. Knowing how the human mind ordinarily operates, the jury should try to determine whether on all of the evidence it can reasonably be inferred that the [petitioner] had a motive to commit the crime. If the existence of a motive can be found,

that is evidence tending to prove the [petitioner's] guilt. If no motive can be found, that may tend to raise a reasonable doubt as to the guilt of the accused or it may raise such a doubt. However, I must instruct you that even a total lack of evidence as to motive would not necessarily raise a reasonable doubt as to the guilt of the [petitioner] so long as there is other evidence produced that is sufficient to prove guilt beyond a reasonable doubt. . . . Whether a motive can be found in this case is a determination that you should make and thereafter decide upon the weight such a motive or absence thereof should have. Ladies and gentlemen, you will weigh and consider all of the evidence before you in arriving at your verdicts."

This issue was preserved at trial. The petitioner's trial counsel, outside of the presence of the jury, objected to the court's charge on motive on the ground that the court marshalled the evidence by identifying the petitioner and his associates in connection with the incident by referring to stealing the Buick with the intention of going to Button Street. The court responded that a reasonable jury would not misunderstand the charge to mean that the court assumed that the stolen Buick was the car used in the shooting.

"The purpose of marshalling the evidence, a more elaborate manner of judicial commentary, is to provide a fair summary of the evidence, and nothing more; to attain that purpose, the [trial] judge must show strict impartiality. . . . The influence of the trial judge on the jury is necessarily and properly of great weight and his lightest word or intimation is received with deference, and may prove controlling. . . . To avoid the danger of improper influence on the jury, a recitation of the evidence should not be so drawn as to direct the attention of the jury too prominently to the facts in the testimony on one side of the case, while sinking out of view, or passing lightly over, portions of the testimony on the other side, which deserve equal attention. . . . Even where the [petitioner] has presented no evidence, the [trial] court's summary of the evidence should try to give fair recognition to relevant points raised by the defense in cross-examination as well as to the general theory of the defense. . . .

"In addition, a court must take care to avoid making improper remarks which are indicative of favor or condemnation . . . and must not indulge in an argumentative rehearsal of the claims of one side only. . . . Such proscriptions are of heightened importance in a criminal case, where considerations of due process require that a criminal defendant be given a fair trial before an impartial judge and an unprejudiced jury in an atmosphere of judicial calm. . . . The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the state's accusations. . . . [P]artisan commentary, if fairly

established by the record . . . deprives defendants of the very essence of their constitutional right to a fair trial by an impartial jury. . . .

"Nevertheless, [i]t is well established that a court may comment to the jury on the weight of the evidence as long as it does not direct the jury as to how to resolve a particular question. . . . In fact, in some cases it is the trial court's duty to refer to testimony in order to assist the jury in relating the facts to the law. . . . Jury instructions must go beyond a mere recitation of legal principles. . . . It would be a Herculean task, and not one required under our law, for the trial court to achieve exact parity in the time spent on comments of both the prosecution and defense portions of a case. [T]he fact that the claims or evidence of one party are stated at much greater length than those of the other does not by itself render the court's summary of the evidence in its charge unfair." (Citation omitted; internal quotation marks omitted.) *State* v. *Campbell*, 149 Conn. App. 405, 412–13, 88 A.3d 1258, cert. denied, 312 Conn. 907, A.3d    (2014).

"To determine whether the court's instructions were improper, we review the entire charge to determine if, taken as a whole, the charge adequately guided the jury to a correct verdict. . . . The pertinent test is whether the charge, read in its entirety, fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . [I]n appeals involving a constitutional question, [the standard is] whether it is reasonably possible that the jury [was] misled." (Citations omitted; internal quotation marks omitted.) *State* v. *Figueroa*, 235 Conn. 145, 170–71, 665 A.2d 63 (1995).

The court's instruction did not assume the validity of the state's theory on motive, but, rather, mentioned the state's theory on motive in order to provide context, so that the jury could understand the charge. It instructed the jury to decide whether the petitioner had a motive to commit the crimes because the existence of motive may tend to prove guilt, while an absence of motive may tend to raise a reasonable doubt as to guilt. The court did not single out any testimony of the state's witnesses or imply that any particular evidence was credible. After reviewing the entire charge, we note that the court instructed the jury multiple times that it was the sole trier of the facts. It also instructed that the jury's recollection of the evidence was controlling and, in general, that if the court should incorrectly state any evidence that the jury should correct the error, because it is the province of the jury to determine what the facts are. See, e.g., *State* v. *Dixon*, 62 Conn. App. 643, 648–49, 772 A.2d 166 (2001) (court did not improperly marshal evidence in favor of state in its instruction where court instructed jury that it was sole trier of fact, that its recollection of evidence controls and that it should

disregard court's opinion regarding facts). Because the trial transcript reveals that the second count of the habeas petition indeed lacked merit, the petitioner had not established a prima facie case. Accordingly, the court properly granted the respondent's motion to dismiss as to that count.

The court did not err in denying the petition for certification to appeal as to its dismissal under Practice Book § 15-8 of count two of the habeas petition. The petitioner has not demonstrated that the issue was debatable among jurists of reason, that a court could resolve the issue in a different manner, or that the questions raised deserve encouragement to proceed further.

B

We next turn to count three of the habeas petition, in which the petitioner alleged that his habeas counsel in a prior proceeding was ineffective for failing to raise a claim of ineffective assistance of appellate counsel on the ground that appellate counsel failed to raise an issue on direct appeal regarding the court's instruction on motive.

For assessing claims of ineffective assistance based on the performance of prior habeas counsel, the *Strickland* standard is as follows. "[When] applied to a claim of ineffective assistance of prior habeas counsel, the *Strickland* standard requires the petitioner to demonstrate that his prior habeas counsel's performance was ineffective and that this ineffectiveness prejudiced the petitioner's prior habeas proceeding. . . . [T]he petitioner will have to prove that . . . prior habeas counsel, in presenting his claims, was ineffective and that effective representation by habeas counsel establishes a reasonable probability that the habeas court would have found that he was entitled to reversal of the conviction and a new trial . . . . Therefore, as explained by our Supreme Court in *Lozada* v. *Warden*, 223 Conn. 834, 613 A.2d 818 (1992), a petitioner claiming ineffective assistance of habeas counsel on the basis of ineffective assistance of [appellate] counsel must essentially satisfy *Strickland* twice: he must prove both (1) that his appointed habeas counsel was ineffective, and (2) that his [appellate] counsel was ineffective." (Citations omitted; internal quotation marks omitted.) *Lapointe* v. *Commissioner of Correction*, supra, 113 Conn. App. 394.

Therefore, in order to set forth a prima facie case of ineffective assistance of habeas counsel on the ground of ineffective assistance of appellate counsel, the petitioner must set forth a prima facie case of ineffective assistance of appellate counsel. Because the petitioner failed to set forth a prima facie case regarding the ineffective assistance of his appellate counsel, he has not set forth a prima facie case of ineffective assistance of his habeas counsel. Accordingly, because count two

was properly dismissed, count three, likewise, was properly dismissed. The court did not abuse its discretion in denying the petition for certification to appeal as to this issue because the petitioner has not demonstrated that the issue was debatable among jurists of reason, that a court could resolve the issue in a different manner, or that the questions raised deserve encouragement to proceed further.

The appeal is dismissed.

In this opinion the other judges concurred.

[1] The petitioner appealed to this court. The appeal was transferred to our Supreme Court pursuant to Practice Book § 65-2 and General Statutes § 51-199 (c). *Ham* v. *Commissioner of Correction*, 301 Conn. 697, 698, 23 A.3d 682 (2011).

[2] There is no indication in the record supporting the idea that consultation with a ballistics expert would have resulted in a more effective cross-examination.

[3] This also was the only evidence submitted by the petitioner in support of count three.

[4] Our review of whether the petitioner has established a prima facie case is, as noted previously, plenary. See *Lapointe* v. *Commissioner of Correction*, supra, 113 Conn. App. 388.